COURT OF APPEALS
DECISION
DATED AND FILED

October 5, 2023

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2023AP1081**

STATE OF WISCONSIN

Cir. Ct. No. 2021TP14

IN COURT OF APPEALS
DISTRICT IV

---

IN RE THE TERMINATION OF PARENTAL RIGHTS TO A.R.G.,
A PERSON UNDER THE AGE OF 18:

D. T. S.,

PETITIONER-RESPONDENT,

V.

B. E. C.,

RESPONDENT-APPELLANT.

---

APPEAL from an order of the circuit court for Rock County: MICHAEL A. HAAKENSON, Judge. *Affirmed*.

¶1 BLANCHARD, J.[1] B.E.C. appeals an order of the circuit court terminating her parental rights to A.R.G., her biological daughter. A jury determined that grounds existed for terminating B.E.C.'s parental rights, ruling that B.E.C. lacked good cause for failing to visit or communicate with A.R.G. for a period of six months or longer. After a dispositional hearing, the court determined that termination of B.E.C.'s parental rights was in A.R.G.'s best interests and issued an order terminating her parental rights. B.E.C. argues that the order terminating her parental rights should be reversed for four reasons: (1) during the pendency of the proceedings, the court erroneously granted a temporary injunction preventing B.E.C. from contacting A.R.G.; (2) the court erroneously excluded relevant evidence at the jury trial; (3) the guardian ad litem (GAL)[2] referred to facts not in evidence in her closing argument to the jury; and (4) the court erroneously exercised its discretion in determining that termination of B.E.C.'s parental rights was in A.R.G.'s best interests. I reject B.E.C.'s arguments and affirm.

## BACKGROUND

¶2 B.E.C. is the biological mother of A.R.G. A.R.G. was born in July 2015, when B.E.C. was 19 years old. B.E.C. was initially A.R.G.'s primary caregiver. In August 2016, D.T.S. was adjudicated the father of A.R.G., and the two parents began sharing placement of A.R.G.

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2)(e) (2021-22). All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

[2] In this context, a guardian ad litem is an attorney appointed by the circuit court to represent a minor child and to "be an advocate for the best interests of a minor child." *See* WIS. STAT. § 767.407(1), (4).

¶3 In October 2017, when A.R.G. was two years old, B.E.C. left A.R.G. in the care of D.T.S. According to B.E.C.'s later testimony, this was because B.E.C. had left her mother's home and was unable to provide stable housing for A.R.G.

¶4 By temporary order issued in November 2017 in the paternity court case, D.T.S. was granted sole legal custody and primary physical placement of A.R.G. B.E.C. was granted "reasonable periods" of supervised placement, to the extent that "the father determines" that the supervised placements were "safe and appropriate."

¶5 Following the November 2017 temporary order, B.E.C. and D.T.S. worked out a placement schedule, with B.E.C. having visits with A.R.G. on an approximately weekly basis. However, these visits became less frequent. According to B.E.C.'s later testimony, this was because she had become addicted to drugs and alcohol and was involved in an abusive relationship.

¶6 In August 2018, D.T.S. began living with K.S., whom D.T.S. would later marry. K.S. began providing care for A.R.G., and eventually became A.R.G.'s stay-at-home caregiver.

¶7 In September 2018, B.E.C. left her abusive relationship. Soon afterward, she became involved with another man and became pregnant with a second child. According to B.E.C.'s later testimony, complications from this pregnancy interfered with her ability to have regular visits with A.R.G. B.E.C.'s final visit with A.R.G. was in January 2019, when A.R.G. was three.

¶8 In July 2019, B.E.C. gave birth to a son. She asked D.T.S. to bring A.R.G. to visit her and the new baby in the hospital. D.T.S. and B.E.C. could not

come to agreement as to the terms of the visit, and it did not occur. According to B.E.C.'s later testimony, she became convinced at that time that D.T.S. would not permit her to see A.R.G., and that she would not be able to see A.R.G. unless she obtained relief from the family court. B.E.C. set goals for herself to meet before she would re-enter A.R.G.'s life, including obtaining for herself stable housing, reliable transportation, and improved mental health.

¶9 Although B.E.C. ceased seeking contact with A.R.G., B.E.C.'s mother and sisters continued to have visits with A.R.G. However, those visits became less frequent over time.

¶10 In April 2021, D.T.S. filed a petition to terminate B.E.C.'s parental rights to A.R.G.

¶11 Involuntary termination of parental rights (or "TPR") cases follow a "two-part statutory procedure." *Steven V. v. Kelley H.*, 2004 WI 47, ¶24, 271 Wis. 2d 1, 678 N.W.2d 856. "In the first, or 'grounds' phase of the proceeding, the petitioner must prove by clear and convincing evidence that one or more of the statutorily enumerated grounds for termination of parental rights exist." *Id.*; WIS. STAT. § 48.31(1). In the second, or dispositional, phase, the court decides whether it is in the best interest of the child that the parent's rights be terminated. *Steven V.*, 271 Wis. 2d 1, ¶27; WIS. STAT. § 48.426(2).

¶12 As grounds for the TPR petition, D.T.S. alleged abandonment under WIS. STAT. § 48.415(1)(a)3. and failure to assume parental responsibility under § 48.415(6).

¶13 As discussed below, the jury in this case would eventually find that B.E.C. did not fail to assume parental responsibility, and therefore the central topic

here is the alleged abandonment ground. To prove abandonment, D.T.S. was required to show, among other things, that B.E.C. failed to "visit or communicate" with A.R.G. "for a period of 6 months or longer." *See* WIS. STAT. § 48.415(1)(a)3. As an affirmative defense to abandonment, B.E.C. could show that she had "good cause" for failing to visit or communicate with A.R.G. during the abandonment period. *See* § 48.415(1)(c); ***State v. James P.***, 2005 WI 80, ¶46, 281 Wis. 2d 685, 698 N.W.2d 95.

¶14 Approximately seven months after D.T.S. filed the TPR petition, B.E.C. asked D.T.S. for a visit with A.R.G. In response, D.T.S. filed a motion seeking a temporary injunction prohibiting B.E.C. from visiting or contacting A.R.G. during the pendency of the TPR proceedings. After a hearing, the circuit court granted D.T.S.'s request and issued the temporary injunction.

¶15 In January 2022, D.T.S. filed a motion for partial summary judgment, arguing that there was no genuine dispute of material fact that B.E.C. had abandoned A.R.G. and had failed to assume parental responsibility. The circuit court granted the motion in part, concluding that that there was no genuine dispute of material fact that D.T.S. proved the elements of abandonment and that the "abandonment period" during which B.E.C. did not visit or communicate with A.R.G. was a period of approximately 20 months, from August 1, 2019, to April 9, 2021. However, the court determined that B.E.C.'s good-cause defense to abandonment, as well as the ground based on failure to assume parental responsibility, were inappropriate for summary judgment and should proceed to a jury trial.

¶16 In pretrial proceedings, B.E.C. sought to present evidence of visits that her family members had had with A.R.G., as well as evidence of her family

members' communications with D.T.S. about these visits. B.E.C. argued that this evidence was relevant to her good-cause defense to abandonment because B.E.C.'s family members would testify that they, like B.E.C., had experienced a pattern of denied requests to visit A.R.G. The circuit court determined that this proffered evidence was not relevant and excluded it from the jury trial.

¶17 After a three-day trial, the jury found that B.E.C. lacked good cause for failing to visit or communicate with A.R.G., but found that B.E.C. did not fail to assume parental responsibility. Based on the jury's findings, the circuit court determined that D.T.S. proved abandonment under WIS. STAT. § 48.415(1)(a)3. and grounds for termination existed.

¶18 The case proceeded to a dispositional hearing before the circuit court on the issue of whether termination of B.E.C.'s parental rights was in A.R.G.'s best interests. After a two-day hearing, the court determined that termination was in A.R.G.'s best interests and issued an order terminating B.E.C.'s parental rights. B.E.C. appeals.

## DISCUSSION

¶19 I address in turn each of the four arguments B.E.C. makes, which are summarized above.

### I. Temporary Injunction

¶20 B.E.C. argues that the order terminating her parental rights must be reversed because the circuit court erroneously granted a temporary injunction preventing her from contacting A.R.G. during the pendency of the TPR proceeding. I conclude that B.E.C. has not shown that the court erroneously

exercised its discretion in granting the temporary injunction, and also that she has not shown that the error, if any, requires reversal.

¶21 In a TPR proceeding, the petitioner may request "an injunction prohibiting the person whose parental rights are sought to be terminated from visiting or contacting the child who is the subject of the petition." WIS. STAT. § 48.42(1m)(a). The circuit court may grant the petition if it "determines that the prohibition would be in the best interests of the child." Sec. 48.42(1m)(c).

¶22 As summarized above, in November 2021, approximately seven months after D.T.S. filed the TPR petition, B.E.C. asked D.T.S. for a visit with A.R.G. and D.T.S. responded by seeking a temporary injunction pursuant to WIS. STAT. § 48.42(1m)(a), preventing B.E.C. from visiting or contacting A.R.G. while TPR proceedings were pending. D.T.S.'s request was accompanied by an affidavit averring that B.E.C. had not seen A.R.G., who was then six, since "January or February of 2019" (nearly three years prior to the date of her request to resume contact). D.T.S. also averred that B.E.C. had not contacted him or A.R.G "since July of 2019" and that D.T.S. believed contact was not in A.R.G.'s best interests "at this time and under the current circumstances."

¶23 At a pretrial hearing, the circuit court provisionally granted the temporary injunction, but set the matter for a final hearing the next month. B.E.C. did not file any submissions in advance of the hearing, such as an affidavit responding to the averments in D.T.S.'s affidavit.

¶24 At the hearing, B.E.C.'s trial counsel described the proceeding as involving "kind of an offering of proof" by both sides. B.E.C.'s trial counsel argued against the injunction, representing that B.E.C. had been A.R.G.'s caregiver during the early years of her life, though acknowledging that A.R.G.

7

later "felt that perhaps it wasn't in her daughter's best interest to see her at certain times." B.E.C.'s trial counsel represented that B.E.C. had not had contact with A.R.G. because she had a "checklist of things that she wanted to complete" so that she could become the "mom that [A.R.G.] deserves." B.E.C.'s trial counsel represented that, although it was unclear whether A.R.G. wished to see B.E.C., B.E.C. wanted to determine if "that bond or that attachment is still there."

¶25 The GAL argued in favor of the temporary injunction, noting that "for whatever reasons, for years [B.E.C.] has decided not to exercise" her parental rights, and that it was unfair to the child to resume that relationship at that time because B.E.C. could ultimately have "no legal relationship with this child."

¶26 D.T.S. asked the circuit court to take judicial notice of the November 2017 paternity court order, which granted D.T.S. sole legal custody of A.R.G. and limited B.E.C.'s contact with A.R.G. to supervised visits "as the father determines are safe and appropriate."[3] D.T.S.'s trial counsel represented that D.T.S. did not believe that resuming contact would be "safe and appropriate" under the circumstances, noting that if D.T.S. ultimately prevailed in the TPR action, "we've now reintroduced [B.E.C. to A.R.G.] and then have to explain [to A.R.G.] why this person has again left [A.R.G.]'s life." D.T.S.'s trial counsel represented that, according to D.T.S., A.R.G. did not ask about her biological mother any more, but before that, while there was still some contact between B.E.C. and A.R.G., A.R.G. would ask "why her mommy doesn't love her."

---

[3] B.E.C. asserts that this paternity court order "had been subsequently amended" by an unfiled stipulation that D.T.S. and B.E.C. reached in July 2018. However, B.E.C. does not argue on appeal that the circuit court erred by considering the November 2017 paternity court order, nor does she explain how an unfiled stipulation could amend this order.

¶27 The circuit court granted the temporary injunction. It reasoned that D.T.S. "likely has the ability to prohibit" contact under the operative paternity court order, and the court was therefore wary about issuing an order that carried the potential for having conflicting effects with an existing order. The court also expressed concern about A.R.G.'s emotional well-being, noting that "losing a parent … and then having that parent reintroduced and then potentially losing that parent again is a significant traumatic event." The court said that it might be appropriate to consider "reunification efforts" after the conclusion of the TPR proceedings, but with B.E.C.'s future legal rights uncertain, it would be unwise to potentially "reintroduc[e] a mother[,] only to have [A.R.G.] lose her mother again."

¶28 B.E.C. argues that the circuit court erroneously granted D.T.S.'s request for a temporary injunction, and also argues this error requires reversal of the ultimate order terminating B.E.C.'s parental rights because the temporary injunction violated her due process rights.

### A. Whether the circuit court erred in granting the temporary injunction

¶29 The decision to grant a temporary injunction pursuant to WIS. STAT. § 48.42(1m)(c). is a discretionary one, and it is reviewed for an erroneous exercise of discretion. *See David S. v. Laura S.*, 179 Wis. 2d 114, 150, 507 N.W.2d 94 (1993) ("A determination of the best interests of the child in a termination proceeding" is "committed to the sound discretion of the circuit court"); *Delanta W. v. Delano W.*, Nos. 2013AP2445 and 2013AP2446, unpublished slip op. at ¶13 (Ct. App. Mar. 14, 2014) (applying an erroneous exercise of discretion standard to review of a § 48.42(1m)(c) injunction). "A circuit court properly exercises its discretion when it employs a rational thought process based on an

examination of the facts and an application of the correct standard of law." **Sheboygan Cnty. HHS v. Julie A.B.**, 2002 WI 95, ¶43, 255 Wis. 2d 170, 648 N.W.2d 402.

¶30 B.E.C. argues that the circuit court erroneously exercised its discretion because its decision was not based on "examination of the facts," but rather on "speculation, unproven allegations, and unsupported opinion." B.E.C.'s primary argument appears to be that D.T.S. proceeded based on the representations of counsel, rather than evidentiary facts, and that these "hearsay" representations are insufficient as a matter of law to support a temporary injunction suspending contact under WIS. STAT. § 48.42(1m). This argument fails for at least two reasons.

¶31 First, B.E.C.'s argument is based on an inaccurate premise. D.T.S. submitted an affidavit averring facts in support of suspending contact during the pendency of the TPR proceeding, including the averment that B.E.C. had not had contact with her daughter in nearly three years. Further, B.E.C. does not argue that the circuit court erred by taking into account the most recent paternity court order, consistent with D.T.S.'s request that the court take judicial notice of it. This record provided a sound factual basis for the court's determination.

¶32 Second, assuming without deciding that counsel's representations about anticipated testimony are properly characterized as hearsay, "hearsay is competent evidence and may be admissible unless objected to." **Virgil v. State**, 84 Wis. 2d 166, 185, 267 N.W.2d 852 (1978). B.E.C.'s trial counsel did not object to proceeding based upon representations of counsel; moreover, B.E.C.'s trial counsel acknowledged that the hearing was "kind of an offer of proof" by both sides, and based her own argument solely on her own representations about

anticipated evidence.  Accordingly, not only did B.E.C. not object to arguments based on "hearsay," B.E.C.'s counsel expressly adopted this manner of proceeding.  Accordingly, I deem that B.E.C. has forfeited her argument that the court could not rely on representations of counsel at the temporary injunction hearing, and I decline to address this forfeited argument.  *See Tatera v. FMC Corp.*, 2010 WI 90, ¶19 n.16, 328 Wis. 2d 320, 786 N.W.2d 810 ("Arguments raised for the first time on appeal are generally deemed forfeited.").

¶33     B.E.C. also argues that the circuit court's concern over the emotional trauma that A.R.G. might experience from resuming visits that might have to be cut off by an adverse TPR ruling was mere speculation because there was no factual record of exactly how these visits would cause emotional harm.  However, in exercising its discretion, a circuit court is not limited solely to the record, and may also make reasonable inferences from the record.  *See Ocanas v. State*, 70 Wis. 2d 179, 185, 233 N.W.2d 457 (1975).  It is a reasonable—in fact, obvious— inference that a six-year-old child may be traumatized by the experience of reunifying with a parent who has been out of her life for nearly three years, only to then lose that parent again, whether due to an adverse TPR determination or for other possible reasons suggested by the record.  B.E.C. had withdrawn from her daughter's life once, and the circuit court was not required to fully credit the explanation offered by B.E.C.'s trial counsel that B.E.C. was working through a "checklist" to become a better mother.  B.E.C. responds to this point by offering the general point that, even if B.E.C.'s parental rights were terminated, "[r]elationships with biological parents often survive TPR orders, in part because maintaining them is often in the best interest of the child."  That is, B.E.C. asserts that the court could not assume that, even if her rights were terminated, she would be separated from A.R.G.  However, D.T.S.'s trial counsel made it clear at the

11

temporary injunction hearing that D.T.S. did *not* believe that contact with B.E.C. was in A.R.G.'s best interests.[4] I conclude that it was reasonable for the circuit court to infer that, if B.E.C. were permitted to reunify with A.R.G. in the middle of TPR proceedings, there was a risk of "having [a] parent reintroduced and then potentially losing that parent again," and this conclusion defeats the argument B.E.C. advances on this issue.

¶34 Accordingly, B.E.C. has failed to show that the circuit court erroneously exercised its discretion in granting a temporary injunction under WIS. STAT. § 48.42(1m).[5]

## B. Whether Error Requires Reversal

¶35 B.E.C.'s argument concerning the temporary injunction fails for a second reason. Even assuming that the circuit court erroneously exercised its

---

[4] In his respondent's brief, D.T.S. argues that termination of B.E.C.'s parental rights would grant him the legal right to prevent contact with B.E.C. B.E.C. does not reply to this argument, and I deem it conceded. *See* ***United Coop. v. Frontier FS Coop.***, 2007 WI App 197, ¶39, 304 Wis. 2d 750, 738 N.W.2d 578 (lack of a reply to respondent's arguments may be taken as a concession).

[5] B.E.C. makes two other arguments that the circuit court erred in granting the temporary injunction, both of which I reject.

B.E.C. argues that the circuit court's decision "was essentially based on the fact that a TPR petition was pending." This is inaccurate. As explained above, the circuit court's decision was based on concerns that included the potential emotional toll on A.R.G. of reunifying with B.E.C. while the TPR petition was pending.

B.E.C. also argues that the circuit court improperly "afforded the GAL's argument [in favor of the injunction] special deference even though the GAL did not present evidence to support her opinion." However, B.E.C. does not support this argument. It is sufficient to note that the court said at a pretrial hearing (not in conjunction with its ruling at the final hearing on the temporary injunction) that it took the GAL's "recommendation very seriously and significantly," but also said that the court "won't defer" to the GAL's recommendation.

discretion in granting the temporary injunction, B.E.C. fails to timely develop a legally supported and preserved argument as to why this assumed error would require reversal of the court's separate order terminating B.E.C.'s parental rights.

¶36    In her appellant's brief, B.E.C. asserts that the injunction infringed on her "due process right to a fair disposition hearing."  She states that her inability to contact A.R.G. as a result of the injunction "effectively torpedoed" her ability to establish at the dispositional phase that she had a positive relationship with A.R.G., and that this "rendered the dispositional phase fundamentally unfair."  However, A.R.G. does not cite authority as a purported source of the "due process right" that she seeks to invoke, nor does she explain why infringement of this right would require reversal of the result of a "fundamentally unfair" proceeding.  *See State v. Pettit*, 171 Wis. 2d 627, 646, 492 N.W.2d 633 (Ct. App. 1992) (the court of appeals need not address undeveloped arguments or arguments unsupported by legal authority).

¶37    In her reply brief, B.E.C. finally develops her due process argument, contending that under Wisconsin law, parents facing termination of parental rights proceedings are entitled to heightened procedural protections, and under *Mathews v. Eldridge*, 424 U.S. 319 (1976), B.E.C. had a due process right to an evidentiary hearing before the circuit court granted a temporary injunction suspending placement.  However, I need not address an argument made for the first time in a reply brief, which would be generally unfair to the respondent.  *See Dane Cnty. DHS v. J.R.*, 2020 WI App 5, ¶40, 390 Wis. 2d 326, 938 N.W.2d 614 (2019).  Moreover, B.E.C.'s trial counsel did not argue to the court that B.E.C. had a due process right to an evidentiary hearing.  In fact, as explained above, B.E.C.'s trial counsel described the temporary injunction hearing as "kind of an offer of proof," and her arguments were based on her own representations of what the evidence

would be. "Arguments raised for the first time on appeal are generally deemed forfeited." *Tatera*, 328 Wis. 2d 320, ¶19 n.16. B.E.C. forfeited the argument that she had a due process right to an evidentiary hearing on the temporary injunction and I do not discern a sound basis to overlook forfeiture.

## II.       Maternal-Contacts Evidence

¶38      Turning to B.E.C.'s argument that the circuit court erroneously excluded relevant evidence that B.E.C. sought to introduce in support of her good-cause defense to abandonment, I conclude that B.E.C. has not shown that the court erroneously exercised its discretion (and I note in the margin below that, in any case, B.E.C. has not shown that reversal would be appropriate if there were error).

¶39      As noted above, one of the grounds for termination alleged by D.T.S. was abandonment under Wis. Stat. § 48.415(1)(a)3. To prove abandonment under § 48.415(1)(a)3., D.T.S. was required to show, among other things, that B.E.C. failed to "visit or communicate" with A.R.G. "for a period of 6 months or longer." As an affirmative defense to abandonment, B.E.C. could show that she had "good cause" for failing to visit or to communicate with A.R.G. during the abandonment period. Sec. 48.415(1)(c); *James P.*, 281 Wis. 2d 685, ¶46. To repeat, the circuit court here determined on summary judgment that B.E.C. failed to visit or communicate with A.R.G. for a period of six months or longer, and also determined that the "abandonment period" was August 1, 2019, through April 9, 2021, leaving for the jury's determination whether B.E.C. had "good cause" for failing to visit or communicate with A.R.G. during the abandonment period.

¶40      During pretrial proceedings in advance of the jury trial, B.E.C. sought to introduce evidence of her family members' visits with A.R.G. and

communications with D.T.S. about these visits ("the maternal-contacts evidence"). B.E.C.'s trial counsel contended to the circuit court that the maternal-contacts evidence would show that some of B.E.C.'s family members remained in contact with D.T.S. during the abandonment period and continued to have visits with A.R.G., and that these visits became less and less frequent, in part because D.T.S. repeatedly denied visit requests. D.T.S. and the GAL objected to the proffered maternal-contacts evidence on relevance grounds. The court took the matter under advisement and asked B.E.C.'s trial counsel to provide an offer of proof before it ruled.

¶41    B.E.C. filed an offer of proof listing the evidence she sought to admit regarding "attempts made" by B.E.C.'s family members "to contact [D.T.S.] regarding [A.R.G.]" The attempts specified in the offer of proof occurred after April 9, 2021, the date of the filing of the petition. The offer of proof does not purport to explain why the maternal-contacts evidence would be relevant to the issue of good cause.

¶42    At the oral ruling on the motion to exclude the evidence, the circuit court asked B.E.C.'s trial counsel if she wished to supplement the written offer of proof. B.E.C.'s trial counsel responded that there was nothing "additional as far as facts," but that she wanted to add "more information about the relevancy." B.E.C.'s trial counsel represented that, in support of her good-cause defense, B.E.C. would testify that she had eventually given up asking for visits with A.R.G. because D.T.S. repeatedly denied her visit requests and she came to believe that it was futile to continue trying. Specifically, B.E.C.'s trial counsel represented that B.E.C. would testify that, after D.T.S. refused to bring A.R.G. to visit B.E.C. in the hospital around the time of her son's birth, B.E.C. decided that "the only way I

15

can pursue this is by getting myself together and going back to court," and this was why she "stopped communicating with [D.T.S.] directly."

¶43 According to B.E.C.'s trial counsel, the maternal-contacts evidence was relevant to B.E.C.'s good-cause defense because it would show that her other family members also "shared this same theme that … after you hear 'no' so many times, you just kind of stop trying. And so that will go to [B.E.C.]'s good cause[,] explaining how that's what happened to her too."

¶44 The circuit court excluded the maternal-contacts evidence based on a lack of relevance. The court acknowledged that the proffered evidence would establish that "the maternal family was making efforts on their own," but said that the good-cause inquiry was not about the efforts of family members to contact A.R.G. Instead, the court said, this was about "what did [B.E.C.] do? And if she didn't do anything, why didn't she do anything?"

¶45 Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." WIS. STAT. § 904.01. The proponent of the evidence "has the burden to show why the evidence is admissible." *State v. Jenkins*, 168 Wis. 2d 175, 187-88, 483 N.W.2d 262 (Ct. App. 1992). A circuit court's decision to exclude evidence is discretionary and reviewed under the erroneous exercise of discretion standard. *La Crosse Cnty. DHS v. Tara P.*, 2002 WI App 84, ¶6, 252 Wis. 2d 179, 643 N.W.2d 194. A circuit court properly exercises its discretion if it "examine[s] the relevant facts, applie[s] a proper legal standard, and, using a demonstrated rational process, reache[s] a reasonable conclusion." *Martindale v. Ripp*, 2001 WI 113, ¶28, 246 Wis. 2d 67, 629 N.W.2d 698.

¶46    B.E.C. argues that the circuit court erroneously exercised its discretion in excluding the maternal-contacts evidence because the court applied the wrong legal standard, incorrectly interpreting the good-cause statute as asking "*what* B.E.C. did," rather than "why" she did it. According to B.E.C.'s current argument, B.E.C.'s trial counsel argued to the court that B.E.C. "knew, from her mother and sisters, that D.T.S. engaged in an escalating pattern of controlling and limiting visits between A.R.G. and A.R.G.'s maternal extended family—to the point where the family felt it was futile to ask for visits," and that "B.E.C.'s awareness of this pattern was, in part, why she didn't reach out to D.T.S. herself." According to B.E.C., because the court misconstrued the good-cause statute, it erred by failing to recognize the relevance of evidence helping to explain "'why' B.E.C. did what she did."

¶47    B.E.C.'s argument that the circuit court erroneously excluded the maternal-contacts evidence is based on two incorrect interpretations of the proceedings below.

¶48    First, contrary to B.E.C.'s assertion on appeal, B.E.C.'s trial counsel did not clearly argue to the circuit court, as she now argues, that B.E.C.'s "awareness" of an alleged pattern of "controlling and limiting visits" helps explain "why she didn't reach out to D.T.S. herself." B.E.C.'s trial counsel did not represent that B.E.C. was aware that members of her family had experienced such a pattern, nor did trial counsel represent that awareness of such a pattern was a reason why B.E.C. ceased asking for visits herself. B.E.C.'s argument in the circuit court appears to have been that the maternal-contacts evidence was relevant to "good cause" solely because it would show that B.E.C.'s family members had experienced frustrations similar to those experienced by B.E.C.

17

¶49 However, as trial counsel presented arguments in the circuit court, it is difficult to see how B.E.C.'s family members' alleged struggles obtaining visits with A.R.G. could have provided a justification for B.E.C. ceasing to seek visits herself. B.E.C.'s trial counsel represented to the court that B.E.C. made up her mind that she would no longer attempt to seek visits with A.R.G. (and instead she would prepare to revisit the issue of placement in paternity court) after D.T.S. refused to allow A.R.G. to meet B.E.C.'s newborn son in July 2019. But according to B.E.C.'s written offer of proof, the maternal-contacts evidence she sought to introduce involved incidents that occurred much later, in 2021 or 2022. If B.E.C. had made up her mind that she would cease asking for visits in July 2019, it is not apparent how B.E.C.'s family's struggles to obtain visits years later could help explain why B.E.C. ceased asking for visits.

¶50 Second, B.E.C. is incorrect in asserting that the circuit court failed to recognize that the good-cause defense to abandonment set forth in WIS. STAT. § 48.415(1)(c) calls for an inquiry into "'why' B.E.C. did what she did." As a starting point, B.E.C. is correct that § 48.415(1)(c) calls for an inquiry into B.E.C.'s reasons why she did not visit or communicate with her daughter. *See James P.*, 281 Wis. 2d 685, ¶46 ("[Paragraph] 48.415(1)(c) provides an affirmative defense to the abandonment ground if an individual can establish 'good cause' why [that individual] did not visit or have contact with the child."). However, the court expressly recognized that § 48.415(1)(c) calls for analysis of "what did [B.E.C.] do? And if she didn't do anything, why didn't she do anything?" The court did not expressly consider how the maternal-contacts evidence might be relevant to B.E.C.'s subjective reasons helping to explain her failures to visit or communicate with A.R.G.; however, in context, this is because (as explained above), B.E.C.'s trial counsel did not present a clear argument as to

18

how the maternal-contacts evidence was relevant to this issue. B.E.C. essentially attempts to rewrite the relevant record; appellate review is limited to the record as it stands.

¶51     Accordingly, B.E.C. has not shown that the circuit court applied an incorrect legal standard in excluding the maternal-contacts evidence. Based on the record before it, the court "examined the relevant facts, applied a proper legal standard, and, using a demonstrated rational process, reached a reasonable conclusion." *See Martindale*, 246 Wis. 2d 67, ¶28. It was B.E.C.'s burden, as the proponent of the evidence, to show that it was relevant, and the court acted within its discretion when it determined that B.E.C. did not meet that burden. On appeal, B.E.C. advances new arguments in favor of relevance, but these arguments were not presented to the court. I deem them forfeited and determine that they should not be addressed despite forfeiture. *See Tatera*, 328 Wis. 2d 320, ¶19 n.16 ("Arguments raised for the first time on appeal are generally deemed forfeited."); *State v. Rogers*, 196 Wis. 2d 817, 827, 539 N.W.2d 897 (Ct. App. 1995) (the court of appeals generally does not "blindside trial courts with reversals based on theories which did not originate in their forum").

¶52     In sum on this issue, I reject B.E.C.'s argument that the circuit court erroneously excluded the maternal-contacts evidence.[6]

---

[6] Further, even assuming that the circuit court erred, B.E.C. has not shown that this error would require reversal.

(continued)

19

### III. The GAL's Closing Argument

¶53    B.E.C. argues that the GAL made improper closing argument at the jury trial.  The allegedly improper aspect was not objected to.  B.E.C. contends that this argument resulted in plain error.  I conclude that B.E.C. has not shown plain error.

¶54    At the close of the evidence, the attorneys, including the GAL, made closing arguments.  In closing, the GAL spoke only briefly and said the following:

> I deal with a lot of CHIPS proceedings – that's Children in Need of Protection and Services – where many of the parents have very similar situations to [B.E.C.]: Drug addiction, mental health issues, poor housing, bad relationships.  And yet somehow they manage to deal with those issues and see their child all at the same time. [B.E.C.] did not do that.  At all.

¶55    B.E.C.'s trial counsel did not object to the GAL's statements about the GAL's purported experiences with struggling parents in Children in Need of

---

B.E.C. argues that the purported error requires reversal under ***Brown Cnty. v. Shannon R.***, 2005 WI 160, ¶53, 286 Wis. 2d 278, 706 N.W.2d 269, which states that in a TPR proceeding, a parent has a "due process right to present admissible evidence central to" the parent's defense.  However, B.E.C.'s argument that the maternal-contacts evidence is "central" to her defense relies on the faulty premise that "B.E.C.'s knowledge of her family's difficulties led her to believe it would be futile to make further requests to see A.R.G. herself."  As explained above, this premise fails for at least the reason that it does not account for the timing of her family members' visits compared to when B.E.C. herself alleged that she decided to stop requesting visits.

Erroneous exclusion of evidence may also require reversal if the error is prejudicial rather than harmless.  *See **Hannemann v. Boyson***, 2005 WI 94, ¶57, 282 Wis. 2d 664, 698 N.W.2d 714. In his respondent's brief, D.T.S. argues that, even if the circuit court erred by excluding the maternal-contacts evidence, this error was harmless.  B.E.C. makes no reply to this argument, and I deem it conceded.  *See **United Coop.***, 304 Wis. 2d 750, ¶39 (lack of a reply to respondent's arguments may be taken as a concession).

Protection and Services (or "CHIPS") proceedings. Rather, B.E.C.'s trial counsel offered a rebuttal in her own closing:

> You heard [the GAL] talk about these CHIPS proceedings where the State gets involved. And the State never got involved in this case because [A.R.G.] never came to their attention because of anything [B.E.C.] did, presumably, because they are not involved. In CHIPS proceedings, the parents who are struggling, they get a case manager. They get things put in place. They get help with transportation. They get support. The case manager makes sure both parents are following orders. They make sure that both parents are making visits happen. They are there to oversee things.
>
> [B.E.C.] had none of that. She had to fight for everything on her own. So I just don't think it's fair to compare this with that kind of proceeding. And those parents know about something called termination of parental rights.

¶56 The circuit court gave the standard instruction to the jury that it "should carefully consider the closing arguments of the attorneys, but their arguments, conclusions, and opinions are not evidence," and that "[i]f any remarks suggested certain facts not in evidence, disregard the suggestion."

¶57 An attorney may not "suggest the jury reach its verdict by considering facts not in the evidence." *State v. Burns*, 2011 WI 22, ¶48, 332 Wis. 2d 730, 798 N.W.2d 166. Generally, if a party fails to object to an improper statement made in a closing argument, the party "has not preserved the claimed error for appeal." *Door Cnty. v. Scott S.*, 230 Wis. 2d 460, 468, 602 N.W.2d 167 (Ct. App. 1999). However, "[t]he plain error doctrine allows appellate courts to review errors" absent a timely objection. *State v. Jorgensen*, 2008 WI 60, ¶21, 310 Wis. 2d 138, 754 N.W.2d 77.

21

¶58 "Plain error is error so fundamental that a new trial or other relief must be granted even though the action was not objected to at the time.'" *Id.* (quoted source omitted). "To qualify for this doctrine's application, however, the error must be obvious and substantial[,]' and 'so fundamental that a new trial or other relief must be granted even though the action was not objected to at the time.'" *State v. Bell*, 2018 WI 28, ¶12, 380 Wis. 2d 616, 909 N.W.2d 750 (quoted source omitted; alteration in *Bell*). For example, employing the plain error doctrine may be appropriate when "a basic constitutional right has not been extended to the accused." *Jorgensen*, 310 Wis. 2d 138, ¶21. Overall, however, the plain error is to be applied "sparingly." *Id*.

¶59 B.E.C. contends that the GAL argued facts not in evidence. Specifically, B.E.C. argues that the jury had not heard facts about CHIPS proceedings or GAL's experiences with them. B.E.C. argues that the improper closing was "fundamentally unfair" and "unfairly undermined B.E.C.'s defense," because the jury did not know that parents who are subject to CHIPS proceedings, unlike B.E.C., receive help from the government and "are warned that their conduct could lead to the termination of their parental rights." In his respondent's brief, D.T.S. does not dispute that the GAL argued facts not in evidence, but contends that this was not "plain error."

¶60 The GAL's reference to her purported experiences in other cases was not proper, but I conclude that it does not rise to the level of a "fundamental, obvious, and substantial" error requiring reversal. *See id.*, ¶¶21, 23. For example, in *Jorgensen*, our supreme court applied the plain error doctrine to reverse a conviction when the circuit court and prosecutor made a series of errors that deprived the defendant of his constitutional rights to confrontation and due process. *Id.*, ¶¶21, 39, 44. Here, the error was a brief, isolated reference made by

one attorney at the end of a three-day jury trial. It was not vivid or weighty in substance; considered in proper context, it would not have been reasonable for a juror to consider it helpful in any way in reaching a proper verdict.

¶61 Further, B.E.C. does not challenge the admission of any of the evidence presented at trial. *See id.*, ¶22 ("The quantum of evidence properly admitted … [is] particularly important" to the plain error analysis). Nor does B.E.C. argue that the error infringed on her constitutional rights. *See id.*, ¶21 (courts have consistently applied a "'constitutional error standard in determining whether to invoke the plain error rule'" (quoted source omitted)).

¶62 B.E.C. argues that the improper aspect of the GAL's closing argument was particularly significant because a GAL is "a neutral officer of the court" meant to "look[] out for the child's best interest," and due to the "weight given to a GAL's position, improper arguments from the GAL are consequential." However, even assuming that improper arguments by GALs might in some cases be unusually prejudicial because of their unique roles in TPR proceedings, any possible prejudicial effect here was mitigated by the jury instructions to ignore attorney arguments not supported by evidence, by B.E.C.'s trial counsel's rejoinder on these points, and by the insubstantial and brief nature of the comments.[7]

---

[7] B.E.C. acknowledges that her trial counsel addressed the improper aspect of the GAL's closing argument, but argues that the rebuttal "failed" because "it was not possible to meaningfully educate the jury on the advantages that CHIPS parents had over B.E.C. in the space and time allotted for a rebuttal argument." It is true that the jury was not exposed to details regarding CHIPS proceedings. But B.E.C.'s counsel's rebuttal meaningfully addressed the substance of the GAL's comments, to the extent that they could be said to have substance. Counsel distinguished B.E.C.'s situation from that of parents in CHIPS proceedings and argued that CHIPS parents have crucial advantages that B.E.C. did not have. B.E.C.'s trial counsel argued that, unlike B.E.C., parents in CHIPS proceedings "get a case manager" who ensures that

(continued)

¶63    Accordingly, B.E.C. has not shown that the improper aspect of the GAL's closing argument constitutes plain error.

### IV.    Best Interest Factors

¶64    B.E.C. argues that the circuit court erroneously exercised its discretion in determining that termination was in A.R.G.'s best interests.    I conclude that B.E.C. has not shown that the court erroneously exercised its discretion.

¶65    At the dispositional phase of a TPR proceeding, the circuit court must determine whether termination of the parent's parental rights is in the best interests of the child, guided by the best interest factors set forth in WIS. STAT. § 48.426.    *Julie A.B.*, 255 Wis. 2d 170, ¶¶29, 37.    The court's decision is discretionary, and will be affirmed when the court "employs a rational thought process based on an examination of the facts and an application of the correct standard of law." *Id.*, ¶43.

¶66    At the two-day dispositional hearing, the circuit court heard testimony from witnesses who included B.E.C., D.T.S., and D.T.S.'s wife K.S. B.E.C. called as an expert witness a child protective services supervisor, who was not aware of the facts of the case and instead offered testimony about general child welfare practices.

---

parents "are making visits happen," and also argued that parents in CHIPS proceedings "know about something called termination of parental rights."  Given the brevity of the GAL's improper argument, it is not clear how a more substantial response was necessary to be considered effective.

¶67     The circuit court took judicial notice of the fact that D.T.S.'s wife, K.S., filed a petition to adopt A.R.G.  In order for K.S. to adopt A.R.G., B.E.C.'s parental rights would first need to be terminated.  *See* WIS. STAT. § 48.81(4)(b) (the "spouse of the child's parent" may seek to adopt a child if "[t]he parental rights of the child's other parent with respect to the child have been terminated").

¶68     The GAL recommended termination, arguing that A.R.G. "can enter into a more stable and permanent family situation if the Court terminates [B.E.C.]'s parental rights and allows the adoption to go forward."  The GAL indicated that she had spoken to A.R.G., and that A.R.G. wished to be adopted by K.S.

¶69     In its ruling, the circuit court addressed each of the best interest factors listed in WIS. STAT. § 48.426(3).  The court determined that all of the statutory factors favored termination and that terminating B.E.C.'s parental rights was in A.R.G.'s best interests.  I consider B.E.C.'s arguments about these factors below.

*Likelihood of adoption after termination:  WIS. STAT. § 48.426(3)(a)*

¶70     As to the first statutory factor, the circuit court determined that A.R.G.'s adoption is likely, and this favored termination.  B.E.C. concedes that adoption is likely, and that the potential adoptive parent, K.S., "has bonded with A.R.G. and is deeply involved in parenting her."  However, B.E.C. argues that "the court did not explain why this likelihood favored termination under the circumstances of this case."

¶71     B.E.C. is not correct—the circuit court made a record of many reasons why adoption would be in A.R.G.'s best interests.  The court found that

25

A.R.G.'s home environment is loving and stable, that A.R.G. identifies K.S. as her mother, and that K.S. treats A.R.G. like a biological child. By contrast, the court expressed concerns about B.E.C.'s stability as a parent. The court observed that B.E.C. had ceased all contact with her daughter. The court recognized that it had recently prohibited such contact, but said that it was "not clear" why B.E.C. did not try to do more to have contact with A.R.G. before that time. The court found that B.E.C. struggled with mental health issues, and expressed concerns that B.E.C. had not yet chosen a therapist. The court noted that B.E.C. had "previously agreed in the family court setting that she would do certain things" to "improve [herself] and make things better for [A.R.G.]," such as take anger management and parenting classes, but that she had not followed through. The court also found that B.E.C. had set up personal conditions for herself to meet before returning to A.R.G.'s life, but she "didn't follow through" with those. The court found that B.E.C. did not have a suitable living space for A.R.G. B.E.C. does not challenge these findings as clearly erroneous.

¶72 The circuit court also expressed concern about the harm that future family court litigation might do to A.R.G. The court said that B.E.C.'s trial counsel had indicated that she "hope[d] the parents can figure things out" and reach an agreement about co-parenting terms if B.E.C.'s parental rights remained in place. The court noted that "if that hope isn't achieved, well, then [B.E.C.] can go back to court; and then another court will appoint another guardian ad litem, and another judge can decide what's in [A.R.G.]'s best interest." The court observed that litigation takes a toll on children, and "[t]hat involves more emotional stress, sometimes that gets manifested in terms of physical problems." As a result, "termination will allow [A.R.G.] to have a more stable and permanent family relationship. She won't be on this potential roller coaster ride."

26

¶73 Accordingly, the circuit court made a thorough record of why the likelihood of adoption favored termination.

*Age and health of the child:* WIS. STAT. § 48.426(3)(b)

¶74 Regarding the second statutory best interests factor, the circuit court found that A.R.G. is happy and healthy in her current home environment, and this weighs in favor of terminating B.E.C.'s parental rights so that K.S. could adopt. B.E.C. asserts that the court "provided no explanation" for why this factor favored termination, and this factor must be "neutral" because "[t]here was no evidence to suggest that leaving B.E.C.'s rights in place would negatively impact A.R.G.'s health." While the court properly explained its concerns about B.E.C. as a parent and explained why leaving B.E.C.'s parental rights in place could be harmful to A.R.G., we count this as a neutral factor that does not in itself point toward reversal or affirmance of the circuit court's decision.

*Substantial relationships with the parent or other family members:* WIS. STAT. § 48.426(3)(c)

¶75 As to the third factor, B.E.C. contends that the circuit court did not give "on-the-record consideration to the evidence." Again, this is not correct. The court examined the history of A.R.G.'s contacts with B.E.C. and her maternal family. The court found that B.E.C.'s own contacts with A.R.G. ceased in January 2019 and that B.E.C.'s family's contacts had tapered off, substantially ceasing in 2020. The court credited testimony that A.R.G. "no longer asks about" B.E.C and that it was unclear if A.R.G. "would identify or know" B.E.C. or her family "because of the length of time that they've been gone."

¶76 B.E.C. argues that the circuit court did not explain why it did not instead credit other evidence in the record, including testimony by her expert

27

witness as to the negative consequences that children may endure when a biological relationship is severed. But the fact that the circuit court did not credit certain evidence that B.E.C. introduced, and instead credited other contrary evidence, does not mean that the court erroneously exercised its discretion.[8]

*Wishes of the child:* WIS. STAT. *§ 48.426(3)(d)*

¶77 As to the fourth factor, B.E.C. acknowledges that the GAL represented that A.R.G. wished to be adopted. B.E.C. appears to argue that the circuit court could not reasonably credit that representation, contending that the GAL was not credible on the point because she did not explain "how, when, or where A.R.G. was questioned about her wishes." I reject this argument for at least the reason that B.E.C. cites no law showing that GAL must provide these details in this context. *See* **Pettit**, 171 Wis. 2d at 646 (the court of appeals need not address arguments unsupported by legal authority).

*More stable and permanent family relationship:* WIS. STAT. *§ 48.426(3)(f)*

¶78 Regarding the sixth statutory best interests factor, B.E.C. contends that the court's determination was "divorced from the record," and was based on mere speculation that "B.E.C. would not adhere to future agreements or follow family court orders."[9] As explained above, this is not correct. The court

---

[8] In any event, the circuit court expressed skepticism about whether B.E.C.'s expert testimony helped B.E.C., given that B.E.C.'s expert was not familiar with the facts of the case and only offered general testimony about child protective services practices. In its own questioning of B.E.C.'s expert, the court observed that, although child protective services considers the potential negative emotional impact of termination on the child, sometimes "you weigh that and you still find it's appropriate to file the termination."

[9] B.E.C. concedes that the circuit court properly examined the fifth factor, which is the "duration of the separation of the parent from the child." *See* WIS. STAT. § 48.426(3)(e).

thoroughly explained its reasons for determining that, based on the record, A.R.G. would be able to enter into a more stable and permanent family relationship as a result of the termination.

¶79     B.E.C. acknowledges that the circuit court evaluated each pertinent factor, but makes a broad and unpersuasive argument that the court "did not adequately explain its rationale," and therefore "erroneously exercised its discretion."  B.E.C. cites to *Bahr v. Bahr*, 107 Wis. 2d 72, 82, 318 N.W.2d 391 (1982), but to no avail.  In *Bahr* the circuit court merely "recited" the statutory spousal maintenance factors but failed to articulate reasons why these factors favored the court's maintenance award.  *Id.* at 82.  Our supreme court stated that this bare recitation of the spousal maintenance factors fell short of the "*reasoned* decision-making" required.  *Id.* (emphasis in original).  *Bahr* simply states the well-established principle that a circuit court must create a record from which its reasoning in making a discretionary determination can be discerned.  *See, e.g.*, *Hartung v. Hartung*, 102 Wis. 2d 58, 66, 306 N.W.2d 16 (1981) ("[A] discretionary determination must be the product of a rational mental process by which the facts of record and law relied upon are stated and are considered together for the purpose of achieving a reasoned and reasonable determination.").  The circuit court here created such a record, consistent with the standards in *Bahr* and *Hartung*.

¶80     In sum on this issue, I reject B.E.C.'s argument that the circuit court erroneously exercised its discretion in determining that the termination of her parental rights to A.R.G. was in A.R.G.'s best interests.

## CONCLUSION

¶81     For all of these reasons, I affirm the circuit court's order terminating B.E.C.'s parental rights to A.R.G.

*By the Court.*—Order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.